NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NEWARK BRANCH, National Association For the Advancement of Colored People; Paterson Branch, National Association For the Advancement of Colored People; Passaic Branch, National Association For the Advancement of Colored People; Jersey City Branch, National Association For the Advancement of Colored People, New Jersey State Conference, National Association For the Advancement of Colored People, Plaintiffs,

v.

TOWN OF HARRISON, NEW JERSEY, Defendant.

Civ. A. No. 89–5413.

United States District Court, D. New Jersey.

Sept. 6, 1990.

As Amended Nov. 5, 1990.

Jonathan M. Hyman, David Rose, Joshua N. Rose, Everald Thompson, Asst. Gen. Counsel, NAACP/SCF, Rutgers Constitutional Litigation Clinic, Newark, N.J., for plaintiffs.

Voorhees & Aciavatti by Christopher J. Bednarz and Karen P. Weismann, Morristown, N.J., for defendant.

DEBEVOISE, District Judge.

In this action the Newark, Paterson, Passaic and Jersey City Branches of the National Association for the Advancement of Colored People, the New Jersey State Conference of the NAACP, and the National Association for the Advancement of Colored People sue the Town of Harrison, seeking to invalidate the Town's policies and ordinances which limit hiring for municipal jobs to residents of the Town. The population of Harrison is 99.8% non-black. Private employers in Harrison have a workforce that is approximately 22% black. The Town has a workforce of 189 persons which is 0% black. This disparity, plaintiffs charge, is caused by the discriminatory impact of Harrison's residents only requirements.

### A. PROCEDURAL BACKGROUND

Plaintiffs brought an earlier action asserting the same claims and seeking the same relief (Civil Action No. 89–3239). I dismissed the complaint for lack of standing, because plaintiffs had not shown that any individual members of their organizations had suffered requisite "injury in fact," none having been alleged to have sought jobs with the Town of Harrison.

On December 29, 1989 plaintiffs filed the complaint in the instant action. They filed an amended complaint in May 1990. On July 9th, I denied the Town's motion to dismiss on standing grounds, because the amended complaint alleged that specific individual NAACP members had applied for Town jobs and had been rejected because

of the residency requirement.[1] Thus, standing was at least properly alleged. I denied plaintiffs' application for a preliminary injunction upon the Town's agreement to give 30 days notice before any new employee was hired. A short discovery period was agreed upon, and the matter was set down for trial on August 20.

The trial has been concluded. This constitutes my findings of fact and conclusions of law.

## B. THE PERTINENT STATUTES AND ORDINANCE

The Town of Harrison has had a policy of hiring residents for its police, fire and non-uniformed positions for as long as the Town's witnesses could remember (which in some instances was a very long time indeed). The Board of Education on one occasion hired a non-resident (a Black woman possessed of a highly skilled educational specialty), but the municipality has never hired a non-resident or a black.

In 1947 Harrison decided to bring its workforce under the State's Civil Service Act, presently codified at N.J.S.A. 11A:1–1, *et seq.* Under that Act the States' Department of Personnel is charged with establishing titles in the classified service, N.J. S.A. 11A:3–1, with determining whether competitive examinations should be required for a given title, N.J.S.A. 11A:4–2, with establishing and administering competitive examinations for those titles, N.J. S.A. 11A:4–1, and with certifying those eligible applicants who score highest on the examinations to the municipal officer who is the appointing authority, N.J.S.A. 11A:4–8.

In 1978 New Jersey adopted an Act Concerning Residency Requirements for Municipal and County Employees. This Act changed the law to permit the governing body of any local unit to "require ... all officers and employees employed by the local unit ... to be bona fide residents therein." N.J.S.A. 40A:9–1.3. It further permitted a local unit imposing such a requirement "to limit the eligibility of applicants for positions and employment in the classified service of such local unit to residents of that local unit." N.J.S.A. 40A:–9–1.4. The statute provides that if an applicant is not required to be a resident the local unit "shall require ... that all nonresidents subsequently appointed to positions or employments shall become bona fide residents of the local unit within 1 year of their appointment" except as the statute otherwise provides when qualified residents are unavailable or when positions requiring special talents are involved. N.J.S.A. 40A:9–1.5.

When a municipality which has adopted the residency requirement determines that there cannot be recruited a sufficient number of qualified residents for specific positions, it may seek persons residing in the following political subdivisions in the following order: the county in which the municipality is located, contiguous counties to the county in which the municipality is located, the State, any place. The condition of employment of a non-resident is that he or she establish residence in the municipality within a reasonable time. N.J.S.A. 40A:9–1.6.

The Act contemplates that residency requirements may violate anti-discrimination laws and provides that such requirements "shall be subject to any order issued by any court, or by any State or Federal agency pursuant to law, with respect to a requirements of action to eliminate discrimination in employment based upon race, creed, color, national origin, ancestry, marital status or sex." N.J.S.A. 40A:9–1.10.[2]

---

1. On July 13, 1990, 907 F.2d 1408, the Court of Appeals filed an opinion affirming my order dismissing the earlier case on standing grounds, but reversing my order denying plaintiffs' motion to file an amended complaint. The case was remanded for a determination whether an amendment was appropriate. Court of Appeals Docket No. 90–5028 (July 13, 1990). The complaint in the instant case is a *de facto* amend-

ment of the complaint in the earlier case and the parties agreed that the two actions would be deemed to be consolidated.

2. Excepted from the preemption provision is N.J.S.A. 40A:9–1.5 which requires that a municipality having a residency requirement and which permits non-residents to apply for positions, require that non-residents who are appointed become residents within a year of their

The New Jersey Supreme Court has upheld residency requirement ordinances, recognizing an interest in local governments in preferring residents for public employment. *Kennedy v. City of Newark,* 29 N.J. 178, 148 A.2d 473 (1959).

The requirements are different with respect to police force and fire department employees. Prior to 1972 employees in these uniformed services were required to be residents of the municipality which employed them. This legislative policy was reversed in that year, when residency was no longer permitted to be required of police officers and fire fighters. N.J.S.A. 40A:14–122.1 (police officers); N.J.S.A. 40A:14–9.1 (fire fighters); *Booth v. Township of Winslow,* 193 N.J. Super. 637, 475 A.2d 644 (App.Div.1984), *cert. denied,* 97 N.J. 657, 483 A.2d 179 (1984), *cert. denied.* 469 U.S. 1107, 105 S.Ct. 781, 83 L.Ed.2d 776 (1985). However, N.J.S.A. 40A:14–123.1a permits municipalities to grant preference to residents in the initial appointment of police officers. Subsection (a) of the statute provides in part for the classification of applicants in four categories, according to residency; (i) residents of the community, (ii) other residents of the county in which the municipality is situated, (iii) other residents of the State and (iv) all other qualified applicants. Subsection (c) provides that in any municipality operating under the Civil Service Law, the classes defined in subsection (a) shall be considered as "separate and successive lists of eligibles," and that no persons from any class shall be certified for appointment "until all persons in the preceding class or classes shall have been appointed or have declined offers of appointment." The statute has been interpreted to give municipalities the option of determining whether the residency requirement must be met at the closing date for the Civil Service examination or at the actual appointment date. *In re Leary,* 91 N.J. 151, 450 A.2d 504 (1982). A similar statute governs the appointment of members of fire departments. N.J.S.A. 40A:14–10.1a. Thus, while a municipality cannot require

its police and fire personnel to continue to live within its borders, it can limit applicants for police and fire positions to its own residents.

On October 6, 1981 Harrison adopted Ordinance 747 entitled "An Ordinance requiring certain officers and employees to be residents of the Town of Harrison."

Paragraph 1 provides that "all officers and employees of the Town shall, as a condition of employment, be bona fide residents of the Town."

Paragraph 2 provides that "no person shall be an eligible applicant for any position or employment in the classified civil service of the Town who is not a resident of the Town."

Paragraph 5 and 6 address the situations in which a sufficient number of qualified residents available for specific positions cannot be recruited and in which positions require special talents and skills.

Paragraph 8 provides that the Ordinance shall not apply to members of the police or fire departments.

## C. HARRISON'S EMPLOYMENT PRACTICES

Harrison has pursued employment practices which are consistent with the applicable statutory provisions and Ordinance 747.

Uniformed employees are hired from lists of eligible residents. Every three years the State's Department of Personnel administers examinations. It is Harrison's practice to direct the Department of Personnel to classify qualified applicants according to their municipal residence and to submit to it lists limited to residents of the municipality.

The 1988 application forms used for examinations to be taken for Harrison's police and fire positions are in evidence (Exh. P1 and Exh. P2). Each provides in bold print: "In all cases, applicants must be residents of the municipality as of the announced closing date in order to be placed on the resident eligible list. Those municipalities marked (*) require that you also be

---

appointment. Although it is not an issue in this case, it would be surprising if N.J.S.A. 40A:9–1.5 would not also be subject to preemption by any

conflicting federal court or agency order regarding discrimination.

a resident at the time you are appointed." There was an asterisk next to Harrison's name. The form thus notified each applicant that he could apply and be appointed only if he was a resident of that Town both at the closing date for the Civil Service examination and on the date of actual appointment. Harrison in fact has selected police and fire personnel solely from lists containing the names of Harrison residents. When these lists are exhausted the departments wait until the Department of Personnel administers new examinations and submits new lists, again limited to Harrison residents. No non-resident of Harrison has ever been considered for a uniformed position.

Non-uniformed employees consist primarily of laborers and clerk typists. These are non-competitive positions, and no examinations are administered prior to appointment to them. Rather, appointees serve a probationary period, after which they are appointed to permanent titles pursuant to N.J.A.C. 4A:3–1.2(a).

Harrison is governed by departments, each of which is chaired by a Town Council member. It would appear that employment vacancies are filled in various ways. There have been high school and CETA on-the-job training programs from which persons have moved into non-uniformed positions. In addition, constituents of Council members express an interest in vacancies as they arise, and the Council members thereafter may recommend them for appointment. The Town Council in each case makes the official appointment.

All of the appointments to the non-uniformed positions are subject to the residency requirements of Ordinance 747. No non-resident has ever been considered for a non-uniformed position.

Harrison's workforce today consists of 51 police officers, 58 fire fighters and 80 non-uniformed employees.[3] Not one is black. This total absence of black employ-

ees, plaintiffs charge, is the result of the residency requirements which Harrison has imposed in the past and continues to apply.

## D. PERTINENT DATA

Harrison is a small industrial community. Although it is a part of Hudson County, it is separated from that County's major population centers to the east by the so-called "Meadowlands." Geographically, it is closely aligned with immediately adjacent Essex County to the west and could very well be considered an extension of the City of Newark which it abuts. Union County to the southwest and Bergen and Passaic Counties to the north and northwest are also within easy commuting distances. Morris and Sussex Counties, which are further to the west and northwest, would be within a feasible commuting distance for some but not for other employment positions.

Only .2% of Harrison's population is black. Nevertheless, black representation among employees of private employers in Harrison large enough to be required to file EEO–1 reports is substantial—22.1% in 1988. Black persons constitute 16.1% of the office and clerical employees of such establishments, 7.6% of the officers and managers, 21.4% of the craft workers, 34.1% of the operatives, 29.4% of the laborers and 31.8% of the service workers. Virtually all of them must commute to Harrison from other communities. There is an unusual abundance of commuter options to and from Harrison in all directions by highway, railroad, bus and rapid transit (PATH).

1980 Census figures for seven pertinent counties in Northern New Jersey show the following breakdown of the civilian labor forces:

| County | Total Civ. Labor Force | Blacks | Black % |
|---|---|---|---|
| Bergen | 442,241 | 17,641 | 4.0 |
| Essex | 391,612 | 130,397 | 33.3 |
| Sussex | 54,795 | 286 | 0.5 |
| Hudson | 262,788 | 27,943 | 10.6 |
| Morris | 209,635 | 5,462 | 2.6 |
| Passaic | 215,035 | 23,608 | 11.0 |
| Union | 256,914 | 38,756 | 15.1 |
| Totals | 1,832,420 | 244,093 | 13.3% |

**3.** Differing employment figures appear in the evidence, but the total of 189 employees does

not differ materially from other counts.

By contrast, the 1987 EEO–4 figures for the seven county region show that the overall labor force among state and local governments in the same seven county area is:

| County | Total Employees | Blacks | Percentage |
|--------|----------------|--------|------------|
| Bergen | 8,862 | 1,134 | 12.8% |
| Essex | 23,332 | 7,853 | 33.7% |
| Sussex | 853 | 6 | 0.7% |
| Hudson | 8,734 | 1,260 | 14.4% |
| Morris | 4,319 | 456 | 10.6% |
| Passaic | 6,452 | 1,174 | 18.2% |
| Union | 5,710 | 1,039 | 18.2% |
| Total | 58,262 | 12,922 | 22.2% |

Attached to this opinion as Appendix A is a table setting forth summary counts of 1990 certified eligible test takers for county-specific police positions in Essex, Union, Passaic and Morris Counties. The table shows the total number of those who passed the test, the number of black persons who passed, and the total number and the number of black persons in four score ranges: i) 107+, ii) 106–100, iii) 99–80 and iv) 79–68.

## E. THE PLAINTIFFS AND THEIR MEMBERS

Plaintiffs are membership organizations. The County NAACP Branches appearing in this case have memberships of: 2500–Newark; 1300–Jersey City; 300–Passaic; and 800–Paterson. The Branches, the New Jersey Conference and the national organization work through committees dealing with education, political action, legal redress, and labor and industry. Through these committees the NAACP units seek to eliminate discrimination of all kinds and generally to advance the interests of black people.

It is beyond dispute that for generations black persons have been locked out of desirable employment opportunities and a principal goal of the NAACP is to overcome employment discrimination and to enable black persons to participate in the job market on an equal basis.

Although the NAACP Branches have formal memberships and collect annual dues from the members, their efforts are on behalf of all black persons and they undertake to assist black persons claiming to be victims of discrimination whether or not they are formal members of the NAACP.

It will be recalled that I dismissed a prior action brought by the same plaintiffs on the ground that they lacked standing. They were unable to show that any of their members had sought or were seeking employment with the Town of Harrison. After the prior action was dismissed, plaintiffs identified a number of black persons who had taken and passed the police or fire fighter examinations and who, but for the residence requirements, would have been eligible to apply for a position with the Harrison police or fire departments. Plaintiffs also identified a black person who wished to apply for a clerical or nursing trainee position in the non-uniformed sector of the Harrison workforce.

Plaintiffs communicated with these persons and explained that the NAACP was engaged in a litigation program designed to end discriminatory hiring and recruiting procedures in certain communities in Northern New Jersey having overwhelmingly white populations. The persons were asked to apply to Harrison for a police position (or a non-uniformed position in one instance). Each person was also invited to become an NAACP member if he or she were not already a member of the organization.

During the period October 1989 to early January 1990, 18 of these persons, all of whom had become NAACP members, wrote to the personnel director of the Town of Harrison. Of this number, 16 sought police officer positions. Of the 16, 15 were from Newark and one was from Paterson. One person sought both a fire fighter and police officer position. A typical letter reads:

Dear Sir:

I write you now in the hope that you will consider me for a job as a police officer with your police department. I reside in Newark at the above address, am between 18–35 years old, physically fit and am a high school graduate. I

took the most recent police officer examination with the City of Newark and have been placed on the current list of eligibles for the job. They have not offered me a job.

I would like to work for your police department. If there is anything else you need to know or any forms I should fill out, please let me know. Otherwise, please consider this my application.

Similar letters were written by the person seeking a position with either the police department or the fire department and by the person seeking a clerical or nursing trainee position.

The Town Clerk, Josephine M. Catrambone, responded to each application. She wrote to those seeking police department positions:

Dear Mr. _____:
This office is in receipt of your letter requesting employment as a Police Officer with the Town of Harrison Police Department.
Kindly be advised that there is an existing Eligible List of candidates for Police Officer which the State mandates appointments be made from. The current Police Eligible List expires June 15, 1991.

To the person seeking employment with the police or fire department, Ms. Catrambone wrote:

Dear Mr. _____:
Your letter requesting employment with the town of Harrison Fire Department or Police Department was received today. Your overall score is quite impressive, but there are existing Eligible Lists which the State mandates appointments be made from. The Police Eligible List expires June 15, 1990 and the Fire Eligible List expires September 6, 1992.

To the person seeking employment as a clerical worker or as a nurse trainee, Ms. Catrambone wrote:

Dear Ms. _____:
In reference to your request for employment with the Town of Harrison, kindly be advised that at the present time there are no openings.
Your interest in our Town is appreciated.

I recognize that both the application letters and the responses were written with this litigation in mind and were undoubtedly drafted by the parties' lawyers. However, the Catrambone responses to the inquires about police and fire positions (for which she should bear no personal responsibility) are disingenuous in the extreme. While they informed the applicants that they could not be considered because they were not on the existing Eligible List, they failed to inform the applicant that he could never expect to get on any present or future Eligible List because he did not meet the residency requirements. Equally disingenuous was the response to the applicant for the clerical or nurse trainee position. Although it informed the applicant that there were no openings, it failed to inform her that even if there were an opening the applicant could not apply for it because she was not a resident of Harrison.

Six of the persons who wrote letters to the Town of Harrison testified.

John Underwood is a black NAACP member who lives in Newark. He attended Fairleigh Dickinson University and pursued a criminal justice major. Approximately 6½ years ago he was employed as an officer in the University of Medicine and Dentistry Police Department. He was given psychological and physical tests and went through the Police Academy which is also attended by municipal police officers.

For various reasons, including better pension rights, Officer Underwood decided to pursue the position of municipal police officer. In 1988 he applied to take the State Department of Personnel police examination. He observed on the form that he could only take the examination for Newark. Had he been permitted to do so he would have taken the examination for other municipalities, including Harrison. For a Newark resident it would make little difference from the perspective of distance to travel whether he or she worked for the Newark or Harrison Police Department. It would take only ten or fifteen minutes to drive from either headquarters to the other. Some parts of Newark are closer to the Harrison Police Headquarters than

they are to the Newark Police Headquarters.

In any event Officer Underwood took the 1988 examination and scored 74.29, 68 being a passing grade.

Lisa Jones is a black NAACP member who lives in Newark. She presently holds two jobs. She is employed at Armour Distribution in Newark and she is a cashier at Shop–Rite in Kearny. To get to Kearny she takes a bus from Newark through Harrison and into Kearny.

In 1984 Ms. Jones decided that she wished to be a police officer. She wrote to the Town of Harrison inquiring how to apply but was told she had to be a resident. She also made inquiry of the City of Newark and applied to take the examination for Newark in 1988. She took the examination and was placed on Newark's eligible list with a score of 72.150. She has not received a Newark appointment but still wishes to obtain employment with a municipal police department, including Newark and Harrison.

Roger Harris is a black NAACP member who lives in Newark. It takes about fifteen minutes to drive from his home to the Harrison town hall. He presently is employed by a trucking company but in 1988 became interested in becoming a police officer. He inquired about positions in Newark and a number of nearby communities, including Harrison, Bloomfield and Clifton. He observed on the notice forms that only residents could take the examinations for the municipalities in which he was interested. This limitation was made clear to him when he applied to take the examination for Bloomfield and was told he was not eligible because of his residence. Therefore, he took the only examination open to him—the examination for the Newark police force. He passed, scoring 73.57.

Mr. Harris has not been hired by the Newark Police Department but remains interested in a police officer position in Newark or any nearby community, including Harrison.

Kenyan Bowman is a black NAACP member who lives in Newark. It would take him about three minutes to get from his home to Harrison. He owns and operates his own restaurant business but since his high school days he has sought to become a police officer. If he were successful, he would turn over his restaurant business to a family member.

In order to ascertain the availability of police officer positions Mr. Bowman made it a practice to look through the monthly State Civil Service bulletin. He observed that all the municipalities in which he was interested had residency requirements in order to take the examination. That limited him to the Newark and the Essex County examination. He took the 1988 examination and scored 72.150. He was not appointed by the Newark Police Department and still desires a police officer position there or in any of the nearby communities, including Harrison.

Joyce Sykes is a black NAACP member who is a resident of East Orange. She estimates that it would take her 45 minutes to drive to Harrison from her home. She works as a cashier for Pathmark but for four years she has sought to obtain a police officer job. She lived in Newark until recently and therefore applied for the 1988 Newark examination. She passed with a score of 77.720. She did not apply to take the examination for other nearby communities because she observed in the bulletin which announces examinations that an applicant had to be a resident of the community for which the examination is to be taken. She sought and still seeks a police officer position in Newark or any nearby community, including Harrison.

Vivian T. Brown is a black NAACP member who lives in Newark. She attended Essex College of Business and graduated as a nurse assistant in a medical office. She was trained to work for a doctor and in clerical procedures. She has worked for the Newark Extended Care Facility for 18 months.

She seeks employment for which the pay is better than her present pay and consequently in June or July of 1989 she expressed an interest in municipal employment by signing forms circulated in her

office. As recounted above, in December, 1989 she was approached by a representative of the plaintiffs and as a result wrote a letter of inquiry to Harrison. She received a response that no positions were available. She remains interested in employment in her field by Newark or by any nearby community.

Thus six of the persons who wrote letters to Harrison testified. It is reasonable to assume that their situations are typical of the other 12 letter writers. It is also reasonable to assume that the situations of the 15 persons who passed the police examination for Newark are typical of many other black persons who have taken police examinations for Newark and/or Essex County. Appendix A to this opinion (which accompanied the report of Harrison's expert) shows that in 1990 there were 174 black certified eligible test takers for Essex County police positions.

## F. ULTIMATE FINDINGS AND CONCLUSIONS OF LAW

### 1. *Standing*

Harrison urges that the action must be dismissed because the plaintiff organizations lack standing. I discussed the pertinent legal principles in my July 9, 1990 opinion which sets forth my reasons for denying Harrison's motion to dismiss on standing grounds. Further, the Third Circuit opinion on the appeal from my order of dismissal of the earlier case addressed the issue of standing. *Newark Branch, National Association for the Advancement of Colored People v. Town of Harrison, New Jersey*, 907 F.2d 1408 (3d Cir.1990) (herein referred to the "Third Circuit NAACP Opinion"). The Court stated:

> ... the [Supreme] Court has found that under certain circumstances an injury to an association's members will satisfy Article III and allow that organization to litigate in federal court on its members' behalf. [*International Union, United Auto. v.*] *Brock*, 477 U.S. [274] at 281 [106 S.Ct. 2523, at 2528, 91 L.Ed.2d 228 (1986) ]. These circumstances are the following:

> (a) its members would otherwise have standing to sue in their own rights; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members to the lawsuit.

> *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 [97 S.Ct. 2434, 2441, 53 L.Ed.2d 383] (1977). *See also Brock*, 477 U.S. at 282 [106 S.Ct. at 2529]; *Warth* [*v. Seldin*] 422 U.S. [490] at 511 [95 S.Ct. 2197, at 2211, 45 L.Ed.2d 343 (1975) ].

At 1413.

■ In the earlier case the complaint was dismissed because the plaintiffs had failed to satisfy prong (1) of the *Hunt* special circumstances; that is, they had not demonstrated that their members would have standing in their own right if they brought the suit; they had not alleged that their members had applied for jobs within Harrison and were turned down because they were not residents.

The proofs in the present case demonstrate that the standing deficiencies of the earlier case have been cured. In fact they have been cured in two ways.

Fifteen members applied for police positions (and in one case also a fire department position). They were rejected because they were not on the then current eligibility lists. That, in effect, was rejection because they were non-residents of Harrison. By reason of Harrison's choice of employment policies non-residents had been excluded from the then current eligibility lists and would continue to be excluded from all future eligibility lists. That constitutes rejection of plaintiffs' members because of their place of residence.

■ Further, plaintiffs have demonstrated derivative standing in another way. The Third Circuit NAACP Opinion relied upon and quoted from *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) in which the Supreme Court allowed non-applicants to recover seniority relief if they could show that they were deterred by the

employer's discriminatory practices from applying for vacant positions and that they would have applied for the job but for those practices. In that case the Supreme Court stated:

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, . . . and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

*Teamsters,* 431 U.S. at 365–66, 97 S.Ct. at 1870 (footnote omitted).

In the present case plaintiffs have a number of members who sought police officer positions, were qualified for such positions as evidenced by their passing the requisite examination and who would have applied for a position on the Harrison police force had they not been confronted by the statement contained in all examination announcements and printed in bold type on the official application for the examination: **"IN ALL CASES, APPLICANTS MUST BE RESIDENTS OF THE MUNICIPALITY AS OF THE ANNOUNCED CLOSING DATE IN ORDER TO BE PLACED ON THE RESIDENT ELIGIBLE LIST. THOSE MUNICIPALITIES MARKED (\*)** [Harrison was marked with an \*] **REQUIRE THAT YOU ALSO BE A RESIDENT AT THE TIME YOU ARE APPOINTED."**

It is true that the State's Department of Personnel prepared the announcements and application forms, but the official documents contained the residents only material only because that was a qualification which Harrison had elected to impose. Thus, Harrison told all potential applicants for employment that only residents would be permitted to apply. It did this in the form of Ordinance 747 in the case of non-uniformed positions.[4] It did this by electing to utilize the statutorily permitted residence requirements in the case of uniformed positions.

It would have been utterly futile for any non-resident to have applied for any position with the Town of Harrison. This was made abundantly clear to all potential applicants for as long as anyone can remember. Thus, plaintiffs' members who wish to obtain municipal employment in Harrison have standing notwithstanding any failure to make formal application.

### 2. *Discriminatory Impact*

■ It is plaintiffs' contention that Harrison's Ordinance 747 and Harrison's adop-

---

**4.** The Town of Harrison states in its brief that Ordinance 747, which applies only to non-uniformed employees "allows the hiring of a non-resident, if that non-resident agrees to become a resident within six months." at p. 6. That provision applies only to those situations where the Town has been unable to find a sufficient number of qualified residents for a specific position. The town has never had to resort to that provision of the Ordinance and it seems unlikely that the Town will ever be unable to find a sufficient number of resident clerk typists and laborers.

The Ordinance is most specific in its command. Other than the very limited and never used exceptions provided therein, it mandates that "no person shall be an eligible *applicant* for any position of employment in the classified civil service of the Town who is not a resident of the Town."

tion of the statutorily authorized residency requirements for police and fire fighter applicants violate Title VII of the Civil Rights Act of 1964, 42 U.S. § 2000e–2 (1982) ("the Act") because the residency requirement for municipal jobs has a disparate impact on blacks.[5] The challenge here is not to residency requirements per se or to the State statutes which give a municipality the power to decide whether applicants be residents of the municipality. The challenge is to Harrison's election to use its powers in a manner which excludes black persons from employment.

Section 703(a)(2) of the Act, 42 U.S.C. § 2000e–2(a)(2), makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race ..."

■ The prohibitions of Title VII extend to practices which have a discriminatory impact regardless of their intent, unless the employer shows that the practice is required by business necessity, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), or otherwise furthers significantly the legitimate employment goals of the employer. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). The Third Circuit has applied this analysis in Title VII disparate impact cases. *See, e.g., Wilmore v. City of Wilmington*, 699 F.2d 667, 670 (3d Cir.1983).

■ It is the plaintiffs' initial burden to establish a *prima facie* case of disparate impact by showing a disparity between the pool of qualified applicants and the actual make-up of the persons holding the applicable jobs and by further showing that this disparity was caused by the specific employment practices allegedly responsible for the violation. *Wards Cove Packing Co., Inc. v. Atonio, supra.* In *Wards Cove*, upon which Harrison relies heavily, the Supreme Court reversed the Court of Appeals, which had held that respondents had made out a *prima facie* case of disparate impact relying solely on respondents' statistics showing a high percentage of nonwhite workers in the cannery jobs and a low percentage of such workers in the non-cannery positions without determining the racial composition of the qualified persons in the labor market.

■ The present case is totally dissimilar from *Wards Cove*. As will be discussed below, we have our own battle of the statisticians in this case. However, I do not believe that such experts are needed in the circumstances of this case to establish that there is a marked disparity between the pool of qualified black applicants for municipal jobs in Harrison and the actual black representation among Harrison's employees. I also do not believe that such experts are needed to establish in the circumstances of this case that the disparity is caused, at least in substantial part, by Harrison's residency requirements.

The jobs at issue are readily identified. They consist generally of two categories, the uniformed positions of police officers and fire fighters and the relatively unskilled non-uniformed positions of clerk typists and laborers.

There is not now and there never has been a black police officer or fire fighter employed by the Town of Harrison. There is not now and there never has been a black clerk typist or black laborer employed by the Town of Harrison. There are presently 51 police officers, 58 fire fighters and 80 non-uniformed employees. None are black.

---

5. Plaintiffs also urge that the circumstances in this case are so stark, that an inference of purposeful discrimination is required. I find, however, that the various residents only requirements arose and evolved during a period of many years and were the product of many factors and considerations which were not race oriented. Even though the residents only requirements may have a major racial impact, it has not been shown that their origin was purposeful racial discrimination.

The geographical area from which Harrison draws employees includes its own County of Hudson as well as Bergen, Essex and Union Counties. These four counties have a total civilian labor force of 1,353,555 of which 214,747 are blacks. By reason of the geographical location and the flow of transportation facilities, Harrison could reasonably be viewed as functionally a component of the City of Newark and a part of Essex County. Newark's population is approximately 60% black. Essex County's civilian labor force totals 391,612 of which 130,397 (or 33.3%) are black. It would be hard to conclude that among the very substantial number of black workers in the four county labor market there are not large numbers of persons qualified to serve as police officers, fire fighters, clerk typists and laborers.

If Harrison's labor force included a significant number of black employees, then it might be necessary to develop refined statistical data showing relevant comparisons. But here, where Harrison across the board has no black employees and where the total work force in its immediate labor market contains at least 214,747 black persons, disparity is at least suggested.

There is substantial additional evidence demonstrating the availability of qualified black employees. Being an industrial town, Harrison's private employers hire large numbers of people in a wide variety of jobs. Of the person employed by private industry, 819 or 22.1% are black. These include only employees of establishments which employ 100 or more employees and thus are required to file EEO-1 reports, which are the source of this information. Since so few black persons live in Harrison most of these persons must have commuted from elsewhere in the labor market which serves Harrison. This body of black employees includes within it a wide range of employment skills. As noted above black persons constitute 16.1% of the office and clerical employees of the private establishments, 7.6% of the officers and managers, 21.4% of the craft workers, 34.1% of the operatives, 29.4% of the laborers and 31.8% of the service workers.[6]

This establishes conclusively that there are available outside of Harrison and within Harrison's labor market a pool of Black persons fully qualified to perform the functions of clerk typists and laborers. There is no category of employee in Harrison's private establishments which corresponds precisely with the positions of police officer or fire fighter. However, since the range of skills of available black workers as demonstrated by the private establishment statistics is so great, it would be reasonable to infer that in the vast black labor force in Harrison's labor market there would be a large number of black persons qualified to serve and wishing to serve as police officers and fire fighters.

This inference is borne out by statistics supplied by Harrison's statistical expert. Appendix A to this Opinion shows for 1990 the number of certified eligible test takers for county specific police positions in Essex, Union, Passaic and Morris Counties. As I understand it, the eligible test takers do not include the persons certified for the various municipalities within these counties except for those persons who took both the municipal and county tests.

The number of certified persons were 822 of whom 221 were black. Of the black persons, 132 scored more than 80 on the test. The last person whom Harrison employed as a police officer scored 70. It will be recalled that each of plaintiffs' members who wrote to Harrison seeking a police officer position scored higher than 70.

6. Harrison notes that there is no residency requirement for teachers employed by Harrison's Board of Education and that nevertheless only one black teacher has obtained employment in Harrison. There are at least three reasons why this does not diminish the significance of the large black employment shown to exist among Harrison's private enterprises: (i) Teachers must have special skills and training, qualifications which are not required of most of the employees of private establishments in Harrison; (ii) despite the absence of a residency requirement, there was testimony that when teacher vacancies arise the word gets around and replacements are sought through local contacts; and (iii) the teacher pay-scale in Harrison is significantly lower than the pay scales in neighboring communities.

This evidence alone requires the conclusion that there is a material disparity between the pool of qualified applicants for each and every Harrison position and the actual make up of persons holding those jobs. The pool of qualified black applicants for each position is significantly greater than 0%, which is the actual make up of black persons holding those jobs.

Through their statistical expert, Herbert Hammerman, plaintiffs sought to establish the precise extent of the disparity and that the disparity is caused by the residency requirement.

Mr. Hammerman noted that black representation among private employer establishments in Harrison was 22.1% in 1988, covering a full range of skills. He noted that the overall percentage of employment of blacks by state and local governments filing EEO–4 reports in the seven county area described in a previous section of this opinion was 1.66 times the proportion of blacks in the civilian labor force residing in the seven county area (22.2% versus 13.3%).

Applying state-wide figures, Mr. Hammerman noted a similar result. Based upon the 12.8% representation of blacks in the New Jersey private labor force and the 21.2% representation of blacks in the state and municipal labor force, the ratio of the percentage of blacks in state and local government employment to private employment would be 1.65 (21.2% versus 12.8%).

Based upon the New Jersey ratio the labor force available to a municipal employer in Harrison would be 1.65 × 22.2, or 36.6% black. Using comparable national figures Mr. Hammerman computed that the black representation in the work force available to Harrison as a municipal employer would be 1.44 × 22.2, or 32.0% black.

As with the overall workforce, the available labor pool for Harrison's protective service employees is composed primarily of Essex and West Hudson counties, but also includes the counties of Bergen, Morris, Sussex, Union, and Passaic. Mr. Hammerman consulted the composite reports of state and local government employers filing EEO-4 reports for 1987. The black representation in the protective services category for that seven county area is as follows:

| County | Total | Black | Percentage |
|--------|-------|-------|------------|
| Essex | 4,045 | 951 | 23.5 |
| Morris | 857 | 16 | 1.9 |
| Sussex | 177 | 0 | 0 |
| Union | 1,567 | 155 | 9.9 |
| Bergen | 1,789 | 93 | 5.2 |
| Hudson | 2,859 | 204 | 7.1 |
| Passaic | 1,668 | 258 | 15.1 |
| Total | 12,962 | 1,677 | 12.9 |

Mr. Hammerman computed the black representation in the protective service category of public employment in the two county area of Essex and Hudson to be (951 + 204)/(4,045 + 2,859) = 1,155/6,904 = 16.7%.

Mr. Hammerman noted that as with the overall workforce, New Jersey and national reports show that blacks are more heavily represented in public employment in protective service (police officer and fire fighter) categories than they are in private employment by employers filing EEO-1 reports. His conclusion was that nationally blacks are interested, available and qualified for employment in the protective service category in public employment at higher rates than they are in the overall employment of private employers filing EEO-1 reports; and that in New Jersey the proportion interested, available and qualified for employment in the protective service category is even higher than in the nation as a whole.

According to Mr. Hammerman, nationally, blacks constituted 12.5% of the workforce of private employer establishments filing EEO-1 forms for 1987 and 14.4% of the protective service category of employees of state and local governments filing EEO-4 forms. Using that ratio (14.4/12.5, or 1.15) and the 22.2% representation of blacks in the private employer establishments in Harrison, his estimate of the representation of blacks interested, qualified and available for employment as police officers and fire fighters in Harrison was 1.15 × 22.2, or 25.5%.

Using the New Jersey ratio (16.0/12/8%, or 1.25), his estimate of the black representation in the police officer and fire fighter

applicant pool for Harrison was $1.25 \times$ 22.2%, or 27.8%.

Accordingly, his best estimate was that the black representation of the persons interested, available and qualified for employment as police officers and fire fighters in Harrison was between 26.4% and 27.8%, and was not lower than 22.2%.

Mr. Hammerman noted that the 1980 census report shows that the population of Harrison was approximately 0.2% black in 1980. He was of the opinion that the labor force which resides in Harrison is unlikely to exceed 0.2% black, and is most unlikely to exceed 0.5% black. He was further of the opinion that the effect of an "Open to Residents of Harrison" requirement is to reduce the available labor force from one which is at least 22.2% black, the labor force for private establishments in Harrison which do not have an "Open to Residents of Harrison" requirement or policy, to an available labor force which is less than 0.5% black. According to Mr. Hammerman such a requirement disproportionately excludes blacks from employment opportunities in municipal employment in Harrison.

Harrison's expert, David W. Griffin, Ph.D., accepted as correct the statistical data upon which Mr. Hammerman relied, but found that his methodology was flawed.

He took issue with Mr. Hammerman's assumption that the black representation in public employment should be at least as high as that in the private sector and with Mr. Hammerman's underlying assumptions (i) that national, state-wide, and locally black representation in state and local government exceeds that in private employment and (ii) that the skills and abilities for entry level municipal employment are no higher than that in the private sector.

Insofar as the non-uniformed jobs in Harrison are concerned Dr. Griffin stated that a dual fluency preference for those positions in Harrison renders Mr. Hammerman's "estimates of black availability for these positions ... a comparison of apples and oranges and should be given no weight."

This criticism by Dr. Griffin has no merit. Harrison's Town Clerk, Josephine N. Catrambone testified that because of Harrison's significant Hispanic population, when employing non-uniformed personnel during the "last few years we have asked for bilinguals. Wherever the employees serve the public we ask for bilinguals." (Tr. at 133). Thus, the practice is too recent to have had a significant effect upon the employment statistics in Harrison. Further, the bilingual policy is applicable only to employees who deal with the public. The clerk typists and laborers who deal with the public would constitute only a fraction of Harrison's non-uniformed personnel. Thus, the limited bilingual policy would affect only marginally Mr. Hammerman's opinion insofar as the non-uniformed employees are concerned.

Dr. Griffin criticizes Mr. Hammerman's analysis on the ground that he did not take into account that the qualifications for entry level municipal positions differ from those of positions in the private sector and that the mix of private and municipal jobs differs. In particular, Dr. Griffin noted that police and fire positions (which are the predominant category of jobs in Harrison) require written and physical examinations, which is not the case with respect to most private jobs.

If precise disparity figures were required there would be some merit to Dr. Griffith's critique of Mr. Hammerman's methodology. However, where black persons represent 0% of Harrison's workforce, it matters little whether there is a disparity of 30%, 20% or even 10% or 15%. Mr. Hammerman employed reasonable statistical methods to determine if a substantial racial disparity exists in Harrison's uniformed and non-uniformed employment. His analysis and the other evidence in the case overwhelmingly establishes the existence of such a disparity. Thus, plaintiffs have established the first prong of a *prima facie* case.

I find that the evidence also compels the conclusion that the residency requirements are the cause of at least a substantial part of the disparity.

For all practical purposes, Harrison has no black residents. Thus, to limit employment or applications for employment to residents effectively excludes black persons from employment by the municipality.

To argue, as the Town does, that the absence of any black employees is not caused by the residency requirement requires a finding either that there are in the pertinent labor market no black persons qualified for the various positions in Harrison or else, assuming that there were such qualified blacks, none of them would apply for and be accepted for such positions.

Neither of those findings could be supported by the evidence. As recited above, there are in the relevant labor market substantial numbers of blacks who are qualified for each category of employment in Harrison.

Further, there is strong evidence that, if the residency requirement were removed, qualified black persons would seek positions with Harrison's municipal government. Plaintiffs' witnesses who had qualified for the police eligibility list testified that they were and are interested in applying for police positions in Harrison. They were prevented from doing so in the past and are now prevented from doing so by the residency requirement.

From the perspective of access Harrison could be considered a part of Newark or Essex County. The distance from many parts of Newark to Harrison's police headquarters is less than the distance to Newark's police headquarters. There are multiple means to travel quickly between most of Essex County and Harrison. There is a large body of black persons in Newark in particular and in Essex County who have qualified for a police eligibility list. It is reasonable to conclude that many of them would have applied to Harrison for employment had it not been for the residency requirement.

The presence of large numbers of non-residents in the workforce of Harrison's private establishments demonstrates the ease of commuting to Harrison. It is reasonable to conclude that were it not for the residency requirement black persons from outside of Harrison would have sought non-uniformed clerk typist or laborer jobs in Harrison. Even Dr. Griffith conceded that if the residency requirement were removed the flow of black applicants for Harrison jobs would go up. (Tr. at 195, 197).

I find that plaintiffs have established the second prong of their *prima facie* case, namely that the residency requirement is the cause of the racial disparity in Harrison's municipal employment. Thus Harrison's facially neutral residency requirements have been shown to have a disproportionate impact upon black persons. *See United States v. Town of Cicero, Ill.*, 786 F.2d 331 (7th Cir.1986) (in particular concurring and dissenting opinion of Judge Posner).[7]

### 3. *Business Justification*

Harrison has advanced business reasons for the residency requirements.

In the case of the protective services it is asserted that it is important that police officers and fire fighters live in the municipality which employs them so that they can be readily recalled when an emergency occurs during their off-duty hours. Knowledge of the community is important. Loyalty is fostered if the uniformed personnel live in the community and participate in its activities. Further, if eligibility lists were opened to non-residents they would contain more names and it would be more expensive and time consuming to investigate persons who lived out of town, perhaps at great distances.

In the case of non-uniformed personnel the residency requirement tends to induce greater loyalty among employees and reduces tardiness and absenteeism.

---

**7.** Suits are pending before other judges of this court challenging the residency requirements of other largely white communities which surround Newark and other parts of Essex County having significant black populations. The instant case and, I believe, each of the other cases, involves the analysis of the effects of the practices of a single community in isolation. It would not appear that any of these cases will require an analysis of the cumulative effects of the residency requirements of all of the defendant communities.

I conclude that plaintiffs have sustained their burden of showing that these justifications are insubstantial and/or that there are available alternative methods of achieving Harrison's objectives.

In the case of police officers and fire fighters, there is a good business reason to require residence in or in proximity to the community served. As Harrison's witnesses testified, off-duty uniformed personnel are subject to recall to duty in emergencies, and it is to the decided advantage of the community if they can return quickly. However, by statute the State of New Jersey precludes Harrison or any other municipality from making residence in the municipality a condition of continued employment for any member of a police or fire department. N.J.S.A. 40A:14–122.1; N.J. S.A. 40A:14–9.1. As a result a number of Harrison's police officers and fire fighters live outside of Harrison, some as far distant as the New Jersey shore or western New Jersey. Harrison can impose a residency requirement on those seeking to take the examination to get on the Harrison eligibility lists, but it cannot impose a residency requirement as a condition of employment. By this means it has prevented black persons from getting on its eligibility lists without achieving the objective of ensuring that police officers and fire fighters will live in the Town.

Further, there are other means of ensuring that the off-duty uniformed personnel will be available in times of emergency. While state law precludes a municipal residency requirement there appears to be nothing in the statute which would prohibit a municipality from making residence within a reasonable response time or distance a condition for continued employment for police officers or fire fighters. The New Jersey Supreme Court has given municipalities wide discretion in applying the applicable statutes. *Matter of Leary,* 91 N.J. 151, 450 A.2d 504 (1982). A reasonable response time or distance requirement would necessarily include areas adjacent to Harrison and enable the Town to draw on black applicants from those areas.

The other reasons which Harrison gives for residency limitations are too insubstantial to justify the discriminatory effect of those limitations. Hopefully, there would be an increase in the number of applicants for positions. This would entail, perhaps, additional expenses in checking out the applicants. However, that should be offset by having a greater choice of more highly qualified applicants. The expenses of investigation as testified by Harrison's witnesses are minimal. If Harrison were to impose reasonable response time or distance limitations, the persons conducting the investigations would not have to go to the ends of the earth to perform their function.

Similarly, the advantage of having off-duty police officers and fire fighters present a local presence and participate in community programs such as Scouts and Little League are plus factors, but they too are not sufficiently substantial to justify the discriminatory effect of the residency requirement.

The reasons Harrison advances for requiring non-uniformed personnel to be residents of the municipality are even less compelling. Basically, there is the feeling that local people will be more loyal in the performance of their work and will be less likely to be late or absent. When off-duty they will mingle with the people whom they serve when at work and they, like resident uniformed personnel, will participate in local activities. These so-called "business reasons" are too nebulous and insubstantial to justify practices which have had a significant discriminatory effect, which have prevented the Town from ever employing a black person.

For the foregoing reasons, I conclude that the residency requirements imposed by the Town of Harrison do not serve in a significant way the Town's legitimate goals.

### G. CONCLUSION

Plaintiffs have established that Harrison's Ordinance 747 and Harrison's adoption of residence requirements for police

and fire fighter applicants violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1982). They seek and are entitled to injunctive relief. I shall schedule a hearing on the terms of the decree. Plaintiffs are also entitled to reasonable attorney's fees and costs.[8]

8. As a housekeeping matter an order should be entered consolidating Civil Action No. 89–3239 with this action.

## APPENDIX A
### SUMMARY COUNTS OF 1990 CERTIFIED ELIGIBLE TEST TAKERS FOR COUNTY–SPECIFIC POLICE POSITIONS

| County | All Passers | | 107 + | | 106 — >100 | | 99 — > 80 | | 79 — > 68 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Black | Total | Black | Total | Black | Total | Black | Total | Black |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| Essex | 315 | 174 | 9 | 0 | 13 | 5 | 167 | 96 | 126 | 73 |
| Union | 239 | 34 | 21 | 0 | 22 | 3 | 144 | 20 | 52 | 11 |
| Passaic | 196 | 10 | 8 | 1 | 15 | 0 | 108 | 5 | 65 | 4 |
| Morris | 72 | 3 | 6 | 0 | 4 | 0 | 48 | 2 | 14 | 1 |
| All | 822 | 221 | 44 | 1 | 54 | 8 | 467 | 123 | 257 | 89 |
| Percent Black | (26.9%) | | (2.3%) | | (14.8%) | | (26.3%) | | (34.6%) | |

Test Score Range

### Sources and Notes

Notes: These counts represent those candidates who took the written examination, who passed relevant age, education, and citizenship requirements, and who reside within the respective counties.

A minimum test score of 68 is required to pass the test.

This data does not reflect any preferences given to eligible candidates who are veterans.